This is an appeal from the grant of motions to dismiss filed by the defendants. We affirm.
The plaintiffs brought this action seeking to represent a class of persons who purchase electric power from Alabama Power Company (APCO). The action is grounded upon the failure in 1975 of the Walter Bouldin Dam which is located on the Coosa River in Elmore County, and which is part of the hydroelectric generating system of APCO. In their complaint the plaintiffs alleged that during 1963 or 1964 the defendant *Page 1165 
Blount Brothers Construction Company (Blount) as general contractor agreed with APCO to construct Walter Bouldin Dam. The defendant, Southern Services, Inc., allegedly prepared the plans and specifications for the dam. Harbert Construction Company (Harbert), another defendant, was a sub-contractor for the powerhouse excavation and embankments, and Harry Hendon 
Associates (Hendon), another co-defendant, contracted with APCO to furnish inspections and to advise of possible construction defects. The complaint alleged that Southern Services improperly designed and prepared the plans and specifications, and that Blount and Harbert breached their contracts by failing to construct the dam in accord with the plans and specifications, causing it to collapse. Hendon's inspections, it further alleged, did not detect the deficiencies which resulted in the collapse. These failures, the plaintiffs continued, resulted in APCO, under Alabama law, Public Service Commission's regulations, and the "fuel adjustment clause," increasing the price it charged its customers proportionately by the price it was required to pay for electricity it otherwise would have generated using Walter Bouldin Dam.
The complaint as amended asserted three separate theories on which relief was based: (1) equitable subrogation; (2) third-party beneficiary principles; and (3) negligence. We shall treat these seriatim.
1. Equitable subrogation.
When the plaintiffs were required to pay the increased electricity rates passed on to them under the "fuel adjustment clause," which is a part of the general rate schedule for APCO, this, they contend, enabled them to be subrogated to the rights of Alabama Power Company to claim those increases in rates
allowed by the Public Service Commission. In short, by paying the increased rate, it is alleged, the plaintiffs paid for APCO's injury and stand in APCO's shoes. APCO cannot make any claim, it is stated, because APCO has passed these "damages" on to the ultimate consumer.
While we agree with the plaintiffs' general statement that Alabama recognizes the doctrine of equitable subrogation, we must also note that its application is dependent upon the facts of the particular case and is not a matter of strict right.Jefferson Standard Life Ins. Co. v. Brunson, 226 Ala. 16,145 So. 156 (1932). In this connection the parties concede that APCO has filed an action against some of these defendants, claiming damages for breach of contract and negligence which consequently resulted in the failure of the dam. If the argument of these plaintiffs is correct, then the rate increase allowed by the "fuel adjustment clause" and the damages which might be recovered by APCO, if any, are the same. Furthermore, according to the plaintiffs, those "damages" cannot be recovered by APCO because it has already collected them through increased rates.
We have been cited to nothing which convinces us of the soundness of either of these two propositions. We cannot determine from either the record or the briefs that the rate increase in question equated the damages recoverable in APCO's separate action. Nor is there any basis indicated for concluding that APCO cannot recover those compensatory damages in that action. See Prestwood v. Carlton, 162 Ala. 327,50 So. 254 (1909), and on the measure of damages, see Tennessee Corp.v. Barnett, 269 Ala. 450, 114 So.2d 135 (1959), and Nashville,C. St. L. Ry. v. Campbell, 212 Ala. 27, 101 So. 615 (1924). If, as the plaintiffs assert, they have paid in increased rates a "debt" owed by the defendants to APCO, we cannot know from the record that the entire debt has been paid. Moreover, subrogation does not arise until the entire debt is satisfied, the reason being that otherwise the rights of the creditor (APCO here) in collecting the full amount of the obligation would be hampered. An exception to this rule is allowed only when there is no possibility of prejudice in the collection of the principal claim. Continental Bank Trust Co. v. AlabamaGeneral Ins. Co., 274 Ala. 622, 150 So.2d 688 (1963); 73 Am.Jur.2d § 30, pp. 617-18. But here APCO is claiming damages for the same *Page 1166 
causative event on which these plaintiffs claim their "damages." Thus that "debt" continues unsatisfied, either in whole or in part, and to acknowledge a right of subrogation here possibly would embarrass that claim. The cause of action based upon subrogation, therefore, does not lie. Brunson,supra. We need not discuss, therefore, whether these facts show that subrogation also might not lie because the "debts" paid by the plaintiffs-class were their own utility bills and not any "debt" of the defendants.
2. The third-party beneficiary issue.
It is well-established in this jurisdiction that one who seeks recovery in contract as a third-party beneficiary must establish that the contract was intended for his direct, as opposed to incidental, benefit. Anderson v. Howard Hall Co.,278 Ala. 491, 179 So.2d 71 (1965). In Anderson the Court looked to the plaintiff's amended complaint and the surrounding circumstances of that direct benefit. We have applied that test here and we cannot conclude that these contracts were made for the direct benefit of APCO's subscribers. Those agreements were made with APCO, and inured to its benefit. No reference in those agreements to any third parties is made in the plaintiffs' complaint. Performance of the contracts would, and did, result in an enhancement of APCO's real and riparian property holdings, to the direct benefit of the corporation itself. The acquisition of this improvement would have an ultimate effect upon the rate-fixing position of the corporation, see generally Tit. 48, § 52, Alabama Code (Recomp. 1958) (Supp. 1973) (now Code of 1975, § 37-1-80) and thus a corresponding ultimate bearing upon the rates its subscribers would be required by the Public Service Commission to pay. That Commission, not APCO, has the duty to fix utility rates.Illinois Central R.R. v. Thomas Ala. Kaolin Co., 275 Ala. 236,153 So.2d 794 (1963). There is nothing contained in these contracts which suggests that in their making the power company was directly concerned with the amount of money subscribers for electrical power would be charged each month. Indeed, even the ultimate completion of the dam, for reasons weighed by the Public Service Commission, might have resulted in no increase at all. To be sure, the construction of Walter Bouldin Dam doubtless was intended to favorably affect the profit-making position of the company, but that corporate decision would not necessarily disclose a purpose to exact the promises of Blount and others because of a direct concern for ultimate rate payers. Cf. Fidelity Deposit Co. of Baltimore, Md. v. Rainer,220 Ala. 262, 267, 125 So. 55 (1929). The subsequent imposition of the "fuel adjustment clause" would not establish any such direct concern. The element of direct concern, and thus direct benefit, distinguishes these contracts from the contract involved in Harris v. Board of Water and Sewer Commissioners,294 Ala. 606, 320 So.2d 624 (1975), cited by the plaintiffs. InHarris this Court found that the people of the city, including the plaintiff Harris, were those who directly benefited from the Board's contract to provide fire hydrants and water for fire protection. In the present case, however, the contracts for construction of the dam do not directly benefit the ultimate consumers of electric power, as we have shown, but inure to the company vis-a-vis its relative rate position before the Public Service Commission. At best, therefore, the plaintiffs are not direct, but only incidental beneficiaries who claim the loss of an economic benefit based upon the alleged failure of a promised performance by a party contractually bound to another. In this the case is not unlikeRobins Dry Dock Repair Co. v. Flint, 275 U.S. 303,48 S.Ct. 134, 72 L.Ed. 290 (1927). In that case the United States Supreme Court held that the charterers of a steamship could not recover as third-party beneficiaries of a dry-docking contract between the company and the shipowners when, because of damage to the ship due to the docking company's fault, the charterers' use of the ship was delayed. Mr. Justice O.W. Holmes wrote that the claimants were neither parties to the contract nor intended to be directly benefited by it. This result was reached under factual circumstances which *Page 1167 
apparently disclosed the necessity of periodic drydocking to assure the operation of the ship. So in this case, while it might be necessary for APCO to construct dams (or to purchase a multitude of other services) in order to establish or maintain a hydroelectric network so that its utility business might serve members of the plaintiffs class, nevertheless the existence of those contracts does not ipso facto make all subsequent purchasers of the end product the direct beneficiaries of the promised performances simply because they have an ultimate economic interest in those performances.
3. Negligence.
The gist of plaintiffs' negligence action is that these defendants owed a duty of care to the plaintiffs because the defendants could have anticipated that the collapse of the Bouldin Dam would cause subscribers to pay increased utility bills. They cite, inter alia, the case of Havard v. Palmer Baker Engineers, Inc., 293 Ala. 301, 302 So.2d 228 (1974) for the proposition that "the ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if care is not exercised." This Court posed the test of foreseeability in the following manner:
 [w]ould an ordinary man in defendant's position, knowing what they knew or should have known, anticipate that injury of the nature of that suffered was likely to result. . . .
Havard dealt with a contract between an engineering firm and the City of Mobile. Under that contract the firm was to make annual inspections and recommendations pertaining to the safe operation of a vehicular tunnel operated by the city. This Court held that a duty to the plaintiff was alleged in a complaint which charged that the defendant knew that petroleum fires were to be reasonably anticipated and that the purpose of fire equipment located in the tunnel was to provide emergency protection to the traveling public:
 It could be foreseen or anticipated by Palmer Baker that a fire could break out in the Tunnel and when it did break out, good and workable fire-fighting equipment would be needed to fight the fire. Otherwise, if a fire could not be foreseen or anticipated, why have any such equipment at all in the Tunnell. . . . Havard at 307, 302 So.2d at 232.
By analogy the plaintiffs conclude that the defendants, being construction and engineering firms, could have foreseen that the collapse of Bouldin Dam would have a "tremendous effect on the generating capacity of the Company system" and "would ultimately mean higher costs to power company customers." Such an analogy, of course, assumes a foreseeable relationship between the construction of the dam and higher costs to consumers because of the imposition of the "fuel adjustment clause."
We disagree with that analogy. The foreseeability aspect ofHavard was premised upon the relationship between the ultimate risk of harm and the professional knowledge of the engineer defendants. The availability of emergency firefighting equipment was viewed as a subject within the scope of their expertise, and it was foreseeable that the particular harm suffered would necessitate the use of such equipment. But the situation here is materially different. The defendants here are construction and engineering firms. They might, indeed, be held to have foreseen the loss of generating capacity due to a collapse of the dam. They are not, however, utility rate makers nor do the facts otherwise suggest that they have any knowledge with respect to that technical subject. For aught that appears the "fuel adjustment clause" is a rate-fixing device authorized by the Public Service Commission. That body, as we have shown, possesses the authority to fix rates, and their power includes the power to allow the imposition of the "fuel adjustment clause." If APCO has been allowed by the Public Service Commission to adjust its rates upward on account of the failure of Bouldin Dam, it is conceivable that APCO will be required by that Commission to adjust them downward should it recover damages in its lawsuit against some of these defendants. Such an issue is for *Page 1168 
the Commission to decide, not the courts. Alabama PublicService Commission v. Southern Bell Telephone Telegraph Co.,268 Ala. 312, 321, 106 So.2d 163 (1958). Accordingly, we are persuaded that the application of the "fuel adjustment clause" was not a matter reasonably foreseeable by the defendants, but was a remote result. Accord, Petition of Kinsman Transit Co.,388 F.2d 821 (2nd Cir. 1968); Northern States Contracting Co.v. Oakes, 191 Minn. 88, 253 N.W. 371 (1934).
Let the judgment granting the defendants' motions to dismiss be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.