405 S.E.2d 456

Annette M. KITTLE and Wheeling Dollar Savings & Trust Co., Guardians of Jeffrey Wayne Van Dyne a.k.a. Jeffrey W. Kittle, an Infant Under the Age of Eighteen Years, Petitioners Below, Appellees,

v.

Reva June ICARD and Taunja Willis Miller, Commissioner of the West Virginia Department of Human Services, Respondent Below, Appellant.

No. 19718.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 8, 1991.

Decided May 23, 1991.

---

John Shank, Deputy Atty. Gen., Charleston, for appellant.

Robert P. Fitzsimmons, William E. Parsons, II, Fitzsimmons & Parsons, Wheeling, and David R. Gold, Gold, Khourey & Turak, Moundsville, for appellees.

Brotherton, Justice:

The primary issue in this case is whether the West Virginia Department of Human Services (DHS) is entitled to be fully reimbursed for the medical expenses it paid on behalf of the appellees from the amount the appellees eventually received as a settlement from the legally liable party.

The appellees are the guardians of Jeffrey Wayne Van Dyne, a.k.a. Jeffrey W. Kittle, who, at the age of twenty-three months, was seriously injured when he was struck by a car and dragged approximately 65 to 70 feet on a concrete road. The child sustained multiple injuries in the July 8, 1988, accident which resulted in severe scarring to his right leg and buttocks and a permanent disability caused by fractures to the right leg and foot.

At the time of the accident, Jeffrey's mother, Annette M. Kittle, was receiving public assistance from the DHS. As one of the conditions of eligibility for assistance with Jeffrey's medical expenses, Ms. Kittle executed an assignment of benefits form in favor of the DHS. Jeffrey's initial medical expenses were $27,317.41.

Reva June Icard, the driver of the car which struck Jeffrey, had an automobile liability insurance policy with a $100,000 limit. Following an investigation, she was deemed judgment proof by the court below. A settlement offer was made by Ms. Icard's insurer, the Erie Insurance Group, for the full liability coverage of $100,000. B. Michael Whorton, an attorney who was appointed Jeffrey's *guardian ad litem*, testified that the value of the child's claim was between $200,000.00 and $250,000.00.

On May 15, 1989, Annette M. Kittle filed a petition for infant settlement and declaratory judgment and a petition for a writ of mandamus in the Circuit Court of Marshall County. The petitioner requested that the court approve the settlement offered by the Erie Insurance Group and find that Jeffrey had not been "made whole" by the settlement and that, as a result, the DHS was not entitled to subrogation for the medical expenses it had paid. Further, the petitioner asked the court to find that the DHS was obligated to pay all outstanding medical bills and future medical bills incurred by Jeffrey. The petitioner claimed that the DHS had paid approximately $10,-000.00 of the total $27,317.41 in medical bills but refused to pay the remaining bills.[1]

In an order dated August 1, 1989, the circuit court granted the relief requested by the petitioner in her declaratory judgment action. Among its findings, the court stated that "[t]he damages which would make Jeffrey Wayne Van Dyne, a.k.a. Jeffrey W. Kittle, whole for all his injuries in this action greatly exceed One Hundred Thirty Thousand Dollars ($130,000.00)." Therefore, the court prohibited the DHS from "seeking to collect subrogation for any expenses paid by its department on behalf of Jeffrey...." The court also found that the DHS had paid approximately $3,500.00 of Jeffrey's outstanding medical bills[2] and that approximately $3,500.00 in additional claims were pending. In this August 1, 1989, order, the court stated that the DHS was "obligated to pay all outstanding bills incurred by Jeffrey ... as a result of the July 8, 1988 collision, including future medical bills and expenses."

The circuit court approved the Erie Insurance Group's settlement offer in an order dated August 3, 1989. The court noted that the child's *guardian ad litem* had investigated the facts and circumstances surrounding the accident and recommended that it would be in the best interests of the

---

1. In the brief filed with this Court, the appellees state that the DHS has paid $12,367.19 towards Jeffrey's medical bills. The appellees also note that in their brief the appellants state that as of September 7, 1989, the Ohio Valley Medical Center had not presented its claim for $21,-517.26. Although these facts are not contained in the record, neither party disputes them.

2. According to the DHS, this amount represents a reduced fee which was paid to medical providers based upon Medicaid fee schedules.

child for the offer to settle to be accepted, "... in view of the circumstances and more particularly in view of the questionable liability of Respondent Reva June Icard and the lack of any meaningful assets above and beyond the insurance policy."[3]

In the memorandum opinion of this case which was issued on September 11, 1989, the court discussed Wisconsin's adoption of the "made-whole rule" in *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis.2d 263, 316 N.W.2d 348 (1982). In *Rimes*, which involved insurer subrogation, the Wisconsin court stated that "[o]ne who claims subrogation rights, whether under the aegis of either legal or conventional subrogation, is barred from any recovery unless the insured is made whole." *Id.* 316 N.W.2d at 353. Basing its decision in part upon the reasoning of the Wisconsin court in *Rimes*, the Circuit Court of Marshall County granted Ms. Kittle's petitions for declaratory judgment and a writ of mandamus. In this opinion, the court stated that the DHS "should be ordered to pay all outstanding medical bills incurred by Jeffrey Van Dyne, as well as future medical expenses, provided he continues to qualify for the State medical assistance program."

The DHS now appeals from the circuit court's October 25, 1989, final order, which prohibited the DHS from seeking reimbursement for any expenses it paid for the appellees from the proceeds of the settlement the appellees reached with the third-party tortfeasor, Reva June Icard. First, the DHS argues that the lower court erred when it applied the "made-whole rule" because the court inappropriately applied common law subrogation principles instead of W.Va.Code § 9–5–11 (1990). Further, the DHS contends that it was error for the lower court to order the DHS to pay all outstanding medical bills, past and future, which related to the accident because such an order compels the DHS to make payments without regard to the federal regulations which govern payments to Medicaid providers.

Medicaid is a joint program between federal and state governments. In order to receive federal funds to administer the program, 42 U.S.C.A. § 1396a(a)(25) requires that states seek reimbursement from legally liable third parties in appropriate circumstances. Specifically, the statute provides, in relevant part, that a state plan for medical assistance must:

"(25) provide (A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties to pay for care and services (available under the plan) arising out of injury, disease, or disability, (B) that where the State or local agency knows that a third party has such a legal liability such agency will treat such legal liability as a resource of the individual on whose behalf the care and services are made available for purposes of paragraph (17)(B), and (C) that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the cost of such recovery, the State or local agency *will seek reimbursement* for such assistance to the extent of such legal liability[.]" (Emphasis added.)

Consistent with this directive, W.Va.Code § 9–5–11(a) (1990) provides, in relevant part, that:

(a) If medical assistance is paid on behalf of a recipient of medical assistance because of any sickness, injury, disease or disability, and another person is legally liable for such expense, the department [division] may recover reimbursement for such medical assistance from such other person, or from the recipient of such assistance if he has been reimbursed by the other person. *The department shall be legally subrogated to the rights of*

---

**3.** The court ordered that $28,000, representing the total medical bills incurred to date, be escrowed and held until final resolution of the issue of whether the DHS is entitled to subrogation. In addition, the amount remaining after attorneys fees and other expenses, $36,286.40, was to be put in a trust account with directions that the principal could be withdrawn only upon court order or upon Jeffrey reaching the age of eighteen.

**130**

*the recipient against the person so liable,* but only to the extent of the reasonable value of the medical assistance paid and attributable to such sickness, injury, disease or disability; and the commissioner may compromise, settle and execute a release of any such claim.... (Emphasis added.)

The DHS maintains that its right to subrogation exists "directly and exclusively" as a result of W.Va.Code § 9–5–11. We agree that pursuant to both 42 U.S.C.A. § 1396a(a)(25) and W.Va.Code § 9–5–11, the DHS is legally subrogated to any right the appellees may have to recover against the legally liable party. Therefore, it is necessary to determine exactly how the general principles of subrogation are most properly applied in this case.

The appellees do not dispute the fact that W.Va.Code § 9–5–11 gives the DHS the right to be subrogated to any settlement proceeds which are received on behalf of Jeffrey. However, the appellees reject the DHS's contention that the meaning of "subrogation" is changed by its use in this statute. Instead, the appellees argue that the absence of any definition of subrogation in W.Va.Code § 9–5–11 indicates that the term should be given its usual and ordinary meaning.

It is the DHS's contention that the lower court found the subrogation provision in W.Va.Code § 9–5–11 "ambiguous" and "incomplete" and proceeded to interpret it by applying common law principles of equity and justice. The DHS maintains that these equitable principles were abrogated by the statute.

We are not persuaded by the State's argument that the use of the term "subrogation" in a statute alters its meaning in some manner and that the DHS is therefore entitled to receive full reimbursement for amounts expended on behalf of Jeffrey without consideration of equitable principles which may be applicable. Although this Court has not addressed this issue in the past, an examination of the commonly accepted definitions of "subrogation," as well as a review of the Wisconsin cases cited by both parties in this case and other

more relevant cases in which State agencies have sought to exercise a statutory right to "subrogation," provide both insight and direction in this case.

■ "Absent a clearly expressed legislative intent requiring otherwise, 'subrogated' is to be given its usual, ordinary meaning." *White v. Sutherland,* 92 N.M. 187, 585 P.2d 331, 334 (1978), citing *Tafoya v. New Mexico State Police Bd.,* 81 N.M. 710, 472 P.2d 973 (1970). "Whether legal or conventional, subrogation is an equitable remedy. The remedy is for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor." *State Farm Mut. Auto Ins. Co. v. Foundation R. Ins. Co.,* 78 N.M. 359, 363, 431 P.2d 737, 741 (1967). " 'Subrogation' is a term of legal art which we assume would not be employed by the drafters of the statute unless they intended it to be construed in its normal sense." *U.S. v. Greene,* 266 F.Supp. 976, 979 (N.D.Ill.1967). In its normal sense, subrogation gives the payor a right to collect what it has paid from the party who caused the damage. However, because this right to collect is an equitable remedy, it is subject to equitable principles.

■ In arguing against the applicability of the "made-whole" rule in this case, the DHS maintains that "the Wisconsin case relied upon by the lower court to deny the DHS recovery would not even control this issue in Wisconsin and should not control the issue here." To a certain extent, we agree with the DHS's position on this point. Although we believe that the "made-whole" rule is a valid equitable principle which may legitimately be applied to the facts of this case, the lower court's reliance upon the *Rimes* decision itself appears to have been misplaced in this instance or, at the very least, unnecessary.

As we noted above, *Rimes v. State Farm Mut. Ins. Co.,* 106 Wis.2d 263, 316 N.W.2d 348, 353 (1982), involved subrogation rights which arose under an insurance contract. Relying upon its earlier decision in *Garrity v. Rural Mut. Ins. Co.,* 77 Wis.2d 537, 253

N.W.2d 512 (1977), the Supreme Court of Wisconsin held in *Rimes* that "under Wisconsin law ... one who claims subrogation rights, whether under the aegis of either legal or conventional subrogation, is barred from any recovery unless the insured is made whole." *Rimes*, 316 N.W.2d at 353.

The DHS argues that the reason the "made-whole" rule should not be applied in this case can be found in a separate opinion decided by the Supreme Court of Wisconsin on the same day as *Rimes* which also involved subrogation. The court did not apply the "made-whole" rule in *Waukesha County v. Johnson*, 107 Wis.2d 155, 320 N.W.2d 1 (1982), although it once again cited *Garrity* and recognized that "[u]nder common law subrogation, the subrogor must be made whole before the subrogee may recover from a third-party tortfeasor." *Id.* 320 N.W.2d at 3. The court noted that subrogation is employed extensively in the insurance industry and that "[t]he rationale commonly given for applying the common law rule to insurance cases is that, 'where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume.'" *Id.*

In *Waukesha County*, the trial court found that pursuant to legislative enactment, the county was entitled to be reimbursed for medical assistance payments from the proceeds of insurance settlements obtained by the defendants. On appeal, however, the Supreme Court of Wisconsin did not give "subrogation" its common law meaning, finding instead that the applicable statute, sec. 49.65, Stats., "renders the common law subrogation principles inapplicable to counties seeking reimbursement pursuant to that section." *Id.* 320 N.W.2d at 3–4.

The relevant statute which was discussed in *Waukesha* specifically prioritized the rights of the county and the public assistance recipient to maintain actions and recover from a third party tortfeasor. In affirming the lower court's grant of summary judgment, the court found the statutory language clear and unambiguous in setting forth the respective rights of the county and public assistance recipient regarding actions against and recovery from a third-party tort-feasor: "Section 49.65 provides that a county may maintain its own action, provided that the recipient is made a party; that the county has equal control over the claim; and, that the county must be paid before the recipient obtains compensation." *Id.*

Several years later, this Wisconsin statute was discussed once again in *Coplien v. Dept. of Health & Social Serv.*, 119 Wis.2d 52, 349 N.W.2d 92 (Wis.App.1984). In *Coplien*, the Court of Appeals of Wisconsin affirmed a circuit court ruling that required the plaintiff to fully reimburse the Department of Health and Social Services for Medicaid payments made to him after his injury, in spite of the fact that he settled his personal injury claim for one-fourth of his damages. The court noted that the plaintiff "cites several cases from other jurisdictions which denied state agencies full reimbursement of medical assistance payments where the recipients had not been made whole by their settlements with liable third parties." *Id.* 349 N.W.2d at 94–95. The court stated that these cases "involved a state court interpreting a state statute, in which the court noted that the legislature had used the term or concept of subrogation, and held that since the legislature had not indicated that normal subrogation principles should not be applied, the court would apply those principles." *Id.* at 95 (citations omitted).

However, the court in *Coplien* stated that, in contrast, Wisconsin's statute, sec. 49.65(4), Stats., "specifically provides that normal subrogation principles are not to be applied to an agency seeking reimbursement of medical assistance payments." *Id.* Although the plaintiff Coplien argued that it was "inequitable" for the Department of Health and Social Services to be fully reimbursed while he was made less than one-quarter whole, the court felt that this argument was best made to the state legislature: "The legislature, in enacting sec. 49.-65(4), Stats., weighed medical recipients' need to be compensated for their injuries against the need for conservation of public funds and determined that the public funds

have priority. We are required to apply the statute as it was written by the legislature." [4] *Id.*

After reviewing the Wisconsin cases cited by the parties in this case, we conclude that they are not applicable to the particular set of facts with which we are now confronted. Our own W.Va.Code § 9–5–11 is unlike Wisconsin's Sec. 49.65, Stats., in that it contains no prioritization provisions and does not specifically state that normal subrogation principles are inapplicable to agencies seeking reimbursement of medical assistance payments. Rather, W.Va.Code § 9–5–11 is closer to those statutes found in the cases that *Coplien* referred to as involving "a state court interpreting a state statute," wherein state courts noted the legislature's use of the concept of subrogation and held that because the legislature had *not* provided that normal subrogation principles should *not* be applied, the court would apply those equitable principles. *Coplien,* 349 N.W.2d at 95.

For example, just as in the case now before us, *Hedgebeth v. Medford,* 74 N.J. 360, 378 A.2d 226 (1977), involved a lawsuit filed on behalf of an infant who was struck by a car. Medicaid made payments of $481.40 for medical expenses. Suing individually and as the child's *guardian ad litem,* the mother sought compensation for loss of services and future earnings and for medical expenses resulting from the injuries. After a jury found the defendant tortfeasor liable, the parties reached a settlement. The court awarded $3,000 to the child and $4,500 to the mother, with medical bills and $1,875 in attorneys fees to be paid out of the latter amount.

Upon learning of the plaintiff's recovery from the liable party, the State of New Jersey sought reimbursement of the amount the plaintiff received from Medicaid. The plaintiff countered this action by arguing that the State must pay its pro rata share of her attorneys fees. The Superior Court, Law Division, charged the

State for its share of the fees. The Appellate Division then reversed this decision, citing the legislative desire to conserve public funds and the "absence of any specific legislative authorization, federal or state, to deduct a pro rata share of counsel fees from third-party liability recoveries." *Id.* 378 A.2d at 229. That court concluded that "the State would not be obligated to pay a share of counsel fees even if equitable principles were applied." *Id.*

However, in reversing the Appellate Division and ordering the State to pay its pro rata share of the plaintiff's counsel fees, the Supreme Court of New Jersey held that the state is governed by equitable principles when it exercises its right of subrogation:

> There is no basis ... for concluding that the Legislature did not intend by its very careful use of the term "subrogation" to import the equitable incidences of that remedy. As we pointed out, that doctrine is distinctly equitable in nature and is generally understood to mean that a party entitled to the right of subrogation should bear or share the reasonable costs which have been incurred in bringing that right to fruition.

*Id.* at 231. The Court then urged that "the result reached today should not frustrate the legislative policy inherent in the mandate to seek reimbursement. Although the history of the act indicates a strong legislative desire to minimize the costs of the program, ... we cannot conclude that the Legislature would have intended a needy recipient to subsidize the State's recovery of medical expenses." *Id.*

The decision in *Hedgebeth* was cited with approval in *Smith v. Alabama,* 461 So.2d 817 (Ala.Civ.App.1984), in which the Alabama Medicaid Agency sought subrogation rights against settlement proceeds paid for a personal injury. The Alabama Code, § 22–6–6(a) (1975), provided, in part, that the "State of Alabama shall be subrogated to such recipient's rights...." *Id.* at 819. In its decision, the Court of Civil Appeals

---

4. Section 49.65(4), Stats., provides, in part, that "[r]easonable costs of collection including attorney's fees shall be deducted first. The amount of assistance granted as a result of the occur-

rence of the injury, sickness or death shall be deducted next and the remainder shall be paid to the public assistance recipient...."

discussed the meaning to be given to the term "subrogation" and concluded that, "[w]hen there is no special legislative intent or definition, statutory terms are to be viewed in light of their usual and ordinary meaning with consideration to the purpose and context of the statute where they are found." *Id.* at 819, citing *State v. Georgia–Florida–Alabama Equipment Co., Inc.,* 425 So.2d 472 (Ala.Civ.App.1982).

In *Smith,* the recipient argued that the full amount of benefits paid by Medicaid should not be reimbursed if he did not receive a full recovery from third parties. Medicaid maintained that the Alabama statute, in particular the phrase "to the extent of the actual amount of the medical assistance payments," evidenced a clear legislative intent that one hundred percent of the benefits be reimbursed. The Alabama Court rejected this argument, however, stating that the rationale totally ignored the phrase "shall be subrogated." *Id.* The Court noted that, "[i]n Alabama, subrogation is not a matter of strict right but is an equitable principle that is dependent on the particular facts of a case." *Id.,* citing *Zeiger v. Blount Bros. Const. Co.,* 364 So.2d 1163 (Ala.1978).

The Medicaid recipient in *Smith* settled his claim for an injury to his knee for $100,000. His medical expenses totalled $6,887.55. The court concluded that "[b]ased on these facts, the injury to the recipient, the settlement amount, medical expenses for the injury, and the absence of other facts as revealed by the record, we do not find that the trial court erred in determining Medicaid should receive the

entire amount." *Smith,* 461 So.2d at 820. The Court cautioned, however, that its holding "should not be understood to mean that, in every instance, based on Alabama Medicaid law, the agency should be fully reimbursed for amounts paid, as such a determination depends on the facts of a particular case." *Id.* at 818.[5]

Turning our attention to the case now before us, we note that this Court has also determined that " '[t]he right of subrogation depends upon the facts and circumstances of each particular case.' *Huggins v. Fitzpatrick,* 102 W.Va. 224, 228, 135 S.E. 19, 20 (1926)." Syllabus point 3, *Ray v. Donohew,* 177 W.Va. 441, 352 S.E.2d 729 (1986). " 'Subrogation, being a creature of equity, will not be allowed except where the subrogee has a clear case of right and no injustice will be done to another.' Syllabus, *Buskirk v. State–Planters' Bank Trust Co.,* 113 W.Va. 764, 169 S.E. 738 (1933)."

We agree with the DHS's contention that there is no ambiguity in W.Va.Code § 9–5–11, which provides, in part, that after making payments on behalf of a recipient of medical assistance as a result of injury, the DHS "shall be legally subrogated to the rights of the recipient against the person so liable...." However, contrary to the DHS's argument, when the term "subrogation" is given its usual and ordinary meaning, equitable principles must be considered.

In this case, the lower court's consideration of the equities is obvious. The court found that "the legislature did not take into account ... the possibility that the recipient of state medical assistance might

**5.** *See also White v. Sutherland,* 92 N.M. 187, 585 P.2d 331, 334 (1978), in which the New Mexico Court of Appeals stated that although 42 U.S.C.A. § 1396a(a)(25) requires a state to seek reimbursement of monies spent on medical assistance payments, the statute does not show an intent that a state is to receive one hundred percent reimbursement; *State v. Cowdell,* 421 N.E.2d 667, 671 (Ind.App. 1 Dist.1981), in which the court noted that since subrogation is an equitable doctrine, its application is always dependent upon the facts and circumstances of each particular case and, therefore, the trial court did not err when it awarded the state less than one hundred percent reimbursement; *Underwood v. Dept. of Health and Rehabilitative*

*Services,* 551 So.2d 522 (Fla.App. 2 Dist.1989), in which the circuit court ruled that the Department of Health and Rehabilitative Services be reimbursed for 100% of the Medicaid payments which were made on behalf of an automobile accident victim. The District Court of Appeals reversed, finding that the lower court erred when "in view of the clear overall intent of Florida's Medical Assistance Law, it failed to apply traditional equitable subrogation principles and prorate or allocate [the Department of Health and Rehabilitative Services'] right to reimbursement for the remaining $50,163.97 of its claim based upon the proportionate amount of total damages appellant was able to recover." *Id.* at 524.

not receive full compensation for his injuries and damages from his tortfeasor." The court took note of testimony that Jeffrey's claim was worth between $200,000 and $250,000 and found that "evidence has shown that the [$100,000] settlement does not fully compensate the infant for his injuries and that further set-offs would reduce any money needed to be saved for the future medical expenses of young Jeffrey."

■ Consequently, we conclude that the lower court did not err when it ruled that the DHS was not entitled to be subrogated to Jeffrey's settlement proceeds because the settlement had not made him "whole." Reimbursement of State agencies through subrogation is envisioned by the federal Medicaid statute and W.Va.Code § 9–5–11. However, because equitable principles must be considered, a total recoupment of expenses by the DHS is not mandated. Therefore, we cannot deem it necessary that the DHS be fully reimbursed in every instance.

■ Finally, the appellants also argue that the lower court erred when it ordered the DHS to pay all of the outstanding medical bills, both past and future, arising out of Jeffrey's accident. The DHS contends that this order failed to consider whether the Department was legally responsible for payment of those bills. We note, however, that in its September 11, 1989, memorandum opinion, the court specifically stated that the DHS "should be ordered to pay all outstanding medical bills incurred by Jeffrey Van Dyne, as well as future medical expenses, *provided he continues to qualify for the State medical assistance program.*" (Emphasis added.) It is clear from this statement that the court intended for the receipt of benefits to be contingent upon Jeffrey's continued eligibility for assistance.

The DHS apparently questions its legal liability for certain bills, as it argues that "[t]he lower court's ruling that the whole bill be paid without regard to the Department's legal liability is incorrect and must be reversed." The DHS maintains that "the lower court's ruling that the difference between the amount paid and the amount submitted remained an outstanding bill and must be paid by the Department is contrary to federal regulations and amounts to little more than a windfall to the providers."

Given the inherent complexities of the Medicaid system, the lower court's order that the DHS pay all outstanding medical bills may have been a bit simplistic under the circumstances. This Court would not suggest that the DHS pay bills for which it is not responsible under the provisions of the Medicaid program. As a creature of statute, the DHS is responsible only for those bills which it is authorized to pay.

The DHS maintains that it has "denied or paid all claims submitted to it. Denials and payments were made in accordance with the Medicaid fee schedule." Specifically, the DHS notes that 42 C.F.R. § 447.15 (1990) provides that:

A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual. . . .

The DHS then states that "the acceptance by the provider of the amount paid by the Department therefore constitutes full payment for services rendered and it is improper for the provider to seek excess amounts from the recipient." We agree with the DHS's position on this point.

However, the facts contained in the record now before us are insufficient to permit this Court to determine whether the DHS has failed to pay any bills it may have been responsible for to this point. As for expenses which may be incurred in the future as a result of Jeffrey's injury, the DHS's responsibility for payment is subject to Jeffrey's continued eligibility for assistance under the guidelines, as the lower court recognized in its opinion.

For the foregoing reasons, the October 25, 1989, order of the Circuit Court of Marshall County is affirmed.

Affirmed.