479 S.E.2d 668

Charles A. PORTER, Plaintiff Below, Appellee,

v.

Michael Kenneth McPHERSON, Defendant Below, Appellee,

The Logan Medical Foundation, d/b/a Logan General Hospital, Intervenor Below, Appellant.

No. 23309.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Nov. 15, 1996.

Donald R. Jarrell, James D. Keffer, Wayne, for appellee Charles A. Porter.

William T. Forester, Logan, for appellant The Logan Medical Foundation.

WORKMAN, Justice:

The intervenor below and the appellant herein, The Logan Medical Foundation, d/b/a Logan General Hospital (hereinafter the Foundation), appeals the final order of the Circuit Court of Cabell County filed on October 31, 1995.[1] On appeal,[2] the Foundation

---

1. This order granted intervenor status to the Foundation but denied the Foundation's motion to reconsider the circuit court's prior order entered on July 26, 1995.

2. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honor-
able Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme

argues that the circuit court erred when it barred and extinguished any rights the Foundation has to pursue collection of unpaid bills for medical services it provided the plaintiff below and an appellee herein, Charles A. Porter (hereinafter the Plaintiff).[3] Upon consideration of these issues, we agree with the Foundation.

## I.

### FACTS

On February 25, 1991, the Plaintiff was involved in an automobile accident and allegedly suffered injuries. By letter dated March 18, 1993, Plaintiff's counsel, Donald R. Jarrell, sent a letter to Dr. R. Padmanaban, an orthopedic surgeon employed by the Foundation, stating, in part: "This letter serves as a letter of protection to your related hospital and/or medical expenses incurred by our client, regarding this incident, from any settlement. Therefore, your bill will be protected from any settlement derived from said lawsuit."[4] According to the Foundation, the Plaintiff received treatment from March 31, 1993, to August 11, 1994, and he owes the Foundation $9,894 for his care.

The Plaintiff filed a lawsuit with respect to the underlying automobile accident against the defendant below and an appellee herein, Michael Kenneth McPherson (hereinafter the Defendant). The Plaintiff states that the Defendant contested liability and disputed whether the Plaintiff's "medical bills were related to the accident, and whether the medical bills, if related, were reasonable and necessary." The Plaintiff claims the Defendant presented testimony from Dr. P. Bachwitt who opined the Plaintiff was not injured and did not receive reasonable or necessary treatment.

According to the Plaintiff, a trial was scheduled to resolve the underlying action; however, the Plaintiff states he suffers from a prior unrelated mental condition caused by post-traumatic stress syndrome and, as a result, was ordered by a doctor not to testify. In addition, Plaintiff's counsel expressed concerns whether the Plaintiff would ever be able to testify at a trial regarding the accident. In light of the Defendant's challenges and the Plaintiff's mental condition, the Plaintiff and the Defendant reached a proposed settlement. In return for a full release, the Defendant offered the Plaintiff $32,000 for pain and suffering only.

Thereafter, a hearing was scheduled to get the circuit court's approval of the proposed settlement. Although the Foundation was not a party to the underlying action, Plaintiff's counsel sent notices of the hearing to the Foundation and to the other medical providers. The notice invited all potential lien holders who provided medical treatment to the Plaintiff to attend the hearing to protect their interests. It informed the medical providers that the proposed settlement is solely for pain and suffering and the proposed offer is insufficient to fully compensate the Plaintiff for his alleged injuries. The notice further apprised the medical providers that the Defendant "dispute[s] the reasonableness and the necessity of certain medical treatment and further den[ies] ... said treatment was proximately caused by the subject accident." The notice concluded by stating: "THEREFORE, this hearing shall be held to determine what, if any, of the medical expenses were reasonable and necessary for injuries allegedly sustained and to either approve or disapprove settlement in this matter."

At the settlement hearing, the Foundation along with many other medical providers appeared. The Plaintiff requested the circuit

---

Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

**3.** Specifically, the Foundation's assignments of error are:

 1. Foundation does not have a subrogation interest in the settlement proceeds and thus is not subject to the "made whole" doctrine outlined in *Kittle v. Icard,* 185 W.Va. 126, 405 S.E.2d 456 (1991).

 2. Foundation's claim against the plaintiff is not derivative in nature or pursuant to a right of subrogation, and therefore the court does not have the authority or discretion to extinguish or bar this direct claim.

**4.** Identical language was included in a letter Plaintiff's counsel sent to the Anesthesia Division of the Foundation.

court accept the settlement and rule he has no obligation to reimburse his medical providers because he is not being fully compensated by the amount of the settlement.[5] In support of his position, the Plaintiff relied upon this Court's decision in *Kittle v. Icard*, 185 W.Va. 126, 405 S.E.2d 456 (1991). Specifically, the Plaintiff argued under *Kittle* that a personal injury victim is not obligated to reimburse his or her medical providers if the victim is not fully compensated by a settlement or an award in the underlying case.[6] The Foundation, however, maintained *Kittle* only limits collection attempts by a party having a subrogation interest in a settlement or an award and it does not bar a non-subrogated party from pursuing an independent cause of action. Based on its interpretation of *Kittle*, the Foundation argued its claim cannot be barred by the decision because it has no subrogation interest in the Plaintiff's underlying action against the Defendant. Therefore, the Foundation asserted it may pursue an independent and direct cause of action against the Plaintiff to be paid for the medical care it provided him. After hearing arguments by the parties, the circuit court ruled in favor of the Plaintiff and entered an order to that effect on July 26, 1995.

The circuit court stated in its order that the medical providers were given the opportunity at the hearing to present evidence with regard to the amount the Plaintiff owed them for their services, the nature of the services provided, the approximate reason the medical treatment was provided, and/or the necessary and reasonable nature of the Plaintiff's treatment. Despite this opportunity, the circuit court found the medical providers offered no evidence in the record that the Plaintiff's medical care and treatment were "reasonable or necessary or proximately caused by the February 25, 1991, motor vehicle accident." [7]

As to the settlement agreement reached between the Plaintiff and Defendant, the circuit court found there were no objections to it and it was made in good faith. The circuit court also determined the settlement was offered solely for the Plaintiff's pain and suffering as a result of the accident and it was not offered as reimbursement for any of the Plaintiff's expenses—either medical or otherwise. The court further stated the

> plaintiff is in need of future and further medical treatment and therefore, under equitable principals [sic], the plaintiff is relieved from the letter of protection issued by his primary counsel to his medical care providers as the plaintiff has not been fully compensated for his injuries and damages allegedly resulting from the February 25, 1991, motor vehicle accident and that to hold otherwise, would not be in the best interest of justice as it would promote delay between the parties.

The circuit court approved the settlement based upon the record, reasons expressed at the June 6, 1995, hearing, and the *Kittle* decision. The circuit court's order then relieved the Plaintiff from reimbursing any of his medical providers, and it extinguished and barred all actions by his medical providers who "had subrogation interests or claims against the plaintiff, arising out of care or treatment allegedly provided to the plaintiff as a result of his motor vehicle accident[.]" Thereafter, the circuit court dismissed the underlying action with prejudice.

At oral argument before this Court, counsel for the Foundation stated his client does not dispute the circuit court's finding that the Plaintiff was not fully compensated by the settlement. In addition, counsel said the Foundation was not asking to receive payment for the Plaintiff's medical care and treatment out of the proceeds of the settle-

---

**5.** The Plaintiff stated he incurred approximately $15,000 in medical bills.

**6.** On another front, the Plaintiff also claimed he may have a head injury, which may or may not be related to the accident, and, if he is able to keep the settlement proceeds, he can investigate this potential problem with those funds.

**7.** The circuit court found only Tri–State MRI spoke to this issue and Tri–State MRI said it performed magnetic resonance imaging (MRI) based upon a referral by Dr. R. Thompson and the Plaintiff was charged a customary fee for the service. The circuit court said no evidence was offered by Dr. Thompson's representative as to the necessity of the MRI and the necessity of the MRI is disputed by Dr. Bachwitt's testimony.

ment. The Foundation merely requests it be able to preserve its ability to collect said debt by available legal means from any other assets the Plaintiff may have.

## II.

## DISCUSSION

### A.

### Standard of Review

■ Initially, we recognize this case involves mixed questions of law and fact. In *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), we stated that, "[a]lthough factual findings are reviewed under the clearly erroneous standard, mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewed *de novo*." *Id.* at 265, 460 S.E.2d at 266. For the following reasons, we find the circuit court erred as a matter of law.

### B.

### Relevance of Subrogation and the Made–Whole Rule

In its June 26, 1995, order, the circuit court specifically relied upon the equitable principles announced in *Kittle* to bar and extinguish the "subrogation interests or claims" of the medical providers who treated the Plaintiff's injuries allegedly received as a result of the automobile accident. Upon review, we find the circuit court's reliance upon the principles set forth in *Kittle* is misplaced.

■ *Kittle* specifically involved a subrogation issue and the underlying principles of equity upon which subrogation is based.[8] Given its usual and ordinary meaning, the doctrine of subrogation provides an equitable remedy to " 'one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor.' " *Id.* at 130, 405 S.E.2d at 460

(quoting *State Farm Mut. Auto. Ins. Co. v. Foundation R. Ins. Co.*, 78 N.M. 359, 363, 431 P.2d 737, 741 (1967)). Put another way, in syllabus point four of *Ray v. Donohew*, 177 W.Va. 441, 352 S.E.2d 729 (1986), we said:

> "The doctrine of subrogation is that one who has the right to pay, and does pay, a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." Syl. Pt. 1, *Bassett v. Streight*, 78 W.Va. 262, 88 S.E. 848 (1916).

*See also Travelers Indem. Co. v. Rader*, 152 W.Va. 699, 703, 166 S.E.2d 157, 160 (1969) (" 'subrogation is an equitable right which arises out of the facts and which entitles the subrogee to collect that which he has advanced' " (quoting *Busch v. Home Ins. Co.*, 97 N.J.Super. 54, 56, 234 A.2d 250, 251 (1967))).

■ Recognizing the equitable nature of subrogation, we held in *Kittle* that it may be limited by what is referred to as the made-whole rule. 185 W.Va. at 133–34, 405 S.E.2d at 463–64. In insurance cases, the made-whole rule has been interpreted as meaning "[u]nder general principles of equity, in the absence of statutory law or valid contractual obligations to the contrary, an insured must be fully compensated for injuries or losses sustained (made whole) before the subrogation rights of an insurance carrier arise." *Wine v. Globe American Casualty Co.*, 917 S.W.2d 558, 562 (Ky.1996); *see also Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864, 868 (Utah 1988) ("Where the insured settles with the tort-feasor, the settlement amount goes to the insured unless the insurer can prove that the insured has already received full compensation."); 16 George J. Couch, *Couch on Insurance 2d* § 61:64 at 145–46 (Ronald A. Anderson & Mark S. Rhodes eds., rev. ed.1983) (stating that "in absence of waiver to the contrary, ... no right of subrogation against the insured exists upon the part of the insurer where the insured's actual loss exceeds the amount recovered from both the insurer and the

---

8. Subrogation did not originate out of statute, custom, or common law but it was adapted from the equitable principles found in the Roman or civil law. 83 C.J.S. *Subrogation* § 2 (1953).

Subrogation is related closely, if not directly, to "the equitable principles of 'restitution' and 'unjust enrichment.' " *Id.* at 581 (footnote omitted).

wrongdoer, after deducting costs and expenses"). The equitable principle underlying the made-whole rule in insurance subrogation cases is that the burden of loss should rest on the party paid to assume the risk (the insurer) and not on the party least able to shoulder the loss (the inadequately compensated insured). *Wine,* 917 S.W.2d at 562.

In *Kittle,* we stated that the equitable principles of the made-whole rule also could be applied to a subrogation action sought by the Department of Human Services (DHS)[9] to recover medical expenses it paid on behalf of a child who received serious injuries when he was struck by an automobile. 185 W.Va. at 128, 134, 405 S.E.2d at 458, 464. The driver of the automobile was found to be judgment proof, and the driver's automobile insurer offered to settle for the full liability coverage of $100,000. *Id.* at 128, 405 S.E.2d at 458. However, the guardian ad litem for the child testified that the actual value of the claim was between $200,000 and $250,000. Thereafter, a proceeding was brought in the circuit court, and the circuit court entered orders, inter alia, approving the settlement, finding the child was not made whole by the settlement, and prohibiting collection efforts by DHS for the medical expenses it paid. DHS appealed, claiming it was entitled to full reimbursement from the settlement proceeds. *Id.*

The subrogation issue arose in *Kittle* by virtue of West Virginia Code § 9–5–11 (1990), which granted DHS the authority to recover reimbursement for medical expenses.[10] *Id.* at 129–30, 405 S.E.2d at 459–60. Although the statute specifically contained the term "subrogated," we found the statute did not disavow normal subrogation principles and gave no priority of reimbursement between a medical recipient and DHS when the medical recipient was not fully compensated for his or her injuries. *Id.* at 132, 405 S.E.2d at 462. Thus, we stated in syllabus point three, in part, that "when the term 'subrogation' is given its usual and ordinary meaning, equitable principles must be considered." *Id.* at 127, 405 S.E.2d at 457. Under these principles, we held the circuit court did not error by denying DHS's subrogation claim because the circuit court found the legislature had not contemplated the situation at hand, the child was not made whole by the settlement, and reimbursement to DHS would reduce the money available to meet the child's future medical expenses. *Id.* at 133–34, 405 S.E.2d at 463–64.

■ In the present case, the Plaintiff argues the same equitable principles should be applied because he was not made whole by the settlement and, therefore, should be relieved from paying his medical providers. However, the underlying problem with the Plaintiff's argument is that the relationship between the Plaintiff and the Foundation is purely that of debtor and creditor. The Foundation was never secondarily liable to "pay" for the Plaintiff's medical expenses, and it has no interest that warrants invoking the equitable principles of the subrogation doctrine and the made-whole rule.

■ Ordinarily, a hospital, physician, and other medical provider are entitled to be compensated for their services by either express or implied contract. 41 C.J.S. *Hospitals* § 14 (1991); 70 C.J.S. *Physicians and Surgeons* § 132 (1987); 10 Samuel Williston, *Williston on Contracts* § 1286A (Walter

9. The Executive Reorganization Act of 1989 redesignated the Department of Human Services as the Division of Human Services under the Department of Health and Human Resources. *See* W. Va.Code § 5F–1–1 (1993); W. Va.Code § 5F–2–1(d)(2) (1993 & Supp.); W. Va.Code § 9–2–1a (1990).

10. In relevant part, West Virginia Code § 9–5–11(a) (1990) provided:
 (a) If medical assistance is paid on behalf of a recipient of medical assistance because of any sickness, injury, disease or disability, and another person is legally liable for such expense, the department [division] may recover reimbursement for such medical assistance from such other person, or from the recipient of such assistance if he has been reimbursed by the other person. The department shall be legally subrogated to the rights of the recipient against the person so liable, but only to the extent of the reasonable value of the medical assistance paid and attributable to such sickness, injury, disease or disability; and the commissioner may compromise, settle and execute a release of any such claim.
This section was rewritten in 1993 and subsequently amended in 1995. *See* W. Va.Code § 9–5–11 (Supp.1996).

H.E. Jaeger ed., 3d ed.1967). If no express contract exists, there is generally an implied agreement that such compensation will be paid by the patient for the reasonable value of the services rendered. 41 C.J.S. *Hospitals* § 14; 70 C.J.S. *Physicians and Surgeons* § 132; *see generally Ye Olde Apothecary v. McClellan,* 163 W.Va. 19, 253 S.E.2d 545 (1979) (holding that physician is entitled to reasonable fee for services and medications supplied). In addition, although we have no cases directly on point in West Virginia, other jurisdictions, in analogous situations, have held this type of relationship does not give rise to subrogation interests in favor of a medical provider.

For instance, in *Sisters of Charity of Providence of Montana v. Nichols,* 157 Mont. 106, 483 P.2d 279 (1971), the Supreme Court of Montana was presented with the question of whether a hospital, which receives payment for medical expenses from a settlement between an accident victim and a tortfeasor, is obligated to pay a pro rata share of the accident victim's attorneys' fees in obtaining that settlement. *Id.* 483 P.2d at 282. The accident victim argued the hospital should be required to pay its share for the same reason a subrogated insurer is required to pay a portion of the cost of recovery. *Id.* 483 P.2d at 283. However, the court disagreed and explained:

> The obligation of the subrogated insurer to share in the costs of recovery from a third party wrongdoer arises because the insurer occupies the position of the insured with coextensive rights and liabilities and no creditor-debtor relationship between them. But here, unlike that situation, *the hospital's claim and lien is based upon a debt owed the hospital by its patient in whose shoes it does not stand for any purpose, the debt being owed to it by its patient irrespective of the patient's rights against a third party wrongdoer.*

*Id.* (emphasis added). Thus, the court in *Sisters of Charity* determined that the rights of a subrogated insurer are distinguishable from that of a hospital owed a debt and "[b]ecause the substitution principle does not apply here, no obligation arises on the part of the hospital to share in the costs of recovery against a third party[.]" *Id.*

Similarly, in *Maynard v. Parker,* 54 Ill. App.3d 141, 11 Ill.Dec. 898, 369 N.E.2d 352 (1977), *aff'd,* 75 Ill.2d 73, 25 Ill.Dec. 642, 387 N.E.2d 298 (1979), a plaintiff was treated at a hospital after receiving injuries in an automobile accident. *Id.* 11 Ill.Dec. at 899, 369 N.E.2d at 353. A settlement fund was created by plaintiff's counsel, and the circuit court ruled that in equity the hospital must pay a portion of the plaintiff's attorney's fees and costs because the hospital directly benefitted from the fund. *Id.* The Illinois appellate court reversed and stated the benefit the hospital derived from the plaintiff's attorney's services "was merely incidental to the primary purpose of obtaining compensation for plaintiff's injuries." *Id.* 11 Ill.Dec. at 900, 369 N.E.2d at 355. In *Maynard,* the court further said the hospital's situation is analogous to a prior judgment creditor, not a subrogee, "in that the hospital's right to payment of its claim is not dependent upon plaintiff's recovery against a third party but rather involves an ordinary debt-creditor relationship." *Id.; see also Bashara v. Baptist Mem. Hosp. Sys.,* 685 S.W.2d 307, 311 (Tex. 1985) (stating that insurer's right to recover in workers' compensation case is based on subrogation, but "hospital's rights are based on independent debtor-creditor relationship").

■ We agree with *Sisters of Charity, Maynard,* and *Bashara*[11] to the extent they declare a hospital's claim for payment of services arises from a debtor-creditor relationship and not subrogation. Accordingly,

---

11. We recognize that in each of these cases the hospitals filed liens for payment of the services they provided. In the present case, however, the Foundation states it has not even attempted to collect its fee but it merely seeks to preserve its right to do so in the future. Although, we acknowledge that many jurisdictions have adopted hospital lien statutes and some of those statutes alter the respective interests of hospitals, patients, attorneys, insurers, and, at times, the public, we do not find the issue of liens significant with respect to the reasons why we rely upon these cases. For a discussion of the issues presented by hospital lien statutes, see Carol A. Crocca, Annotation, *Construction, Operation, and Effect of Statute Giving Hospital Lien Against Recovery From Tortfeasor Causing Patient's Injuries,* 16 A.L.R.5th 262 (1993).

we hold, absent a statute [12] or a contract [13] to the contrary, a medical provider's right to be compensated by a patient is not dependent upon the patient's ability to obtain a recovery for such medical expenses from a tortfeasor. Instead, a medical provider's claim generally rests upon a debtor-creditor relationship, and such a claim cannot be extinguished or barred by the doctrine of subrogation.

Applying these principles to the present case, we conclude that the Foundation has no subrogation rights in the underlying action and the relationship between the Foundation and the Plaintiff is one of debtor and creditor. Although the Plaintiff's letters of protection state the Foundation's bills for "related ... expenses.... will be protected from any settlement," it does not give the Foundation a right to subrogation, and the letter in no way exonerates the Plaintiff from paying his debt to the Foundation in the event the Plaintiff is not fully compensated (made whole) by a settlement or an award or in the event the medical services provided are determined to be unrelated to the automobile accident. As previously indicated, one who receives medical services ordinarily has a contractual obligation to pay the reasonable value of those services irrespective of the made-whole rule.[14] Therefore, we hold the circuit court erred when it relieved the Plaintiff from paying the Foundation. Likewise, we find the circuit court erred when it extinguished and barred any claims the Foundation may have against the Plaintiff for medical expenses he incurred allegedly as a result of the automobile accident.

## C.

### Res Judicata

Even if we determine the Foundation has the right to bring a separate action against the Plaintiff to collect its fees, the Plaintiff asserts that any action the Foundation might bring would be barred by virtue of *res judicata* because the circuit court found the medical providers, although given the opportunity to do so, presented no evidence the Plaintiff's medical care and treatment were "reasonable or necessary or proximately caused by the February 25, 1991, motor vehicle accident." Although it is somewhat presumptuous of the Plaintiff to assert *res*

---

**12.** Frequently, subrogation is codified by statute. *See* W. Va.Code § 23–2A–1 (1994) (subrogation in workers' compensation cases); W. Va.Code § 33–6–31(f) (1996) (subrogation in motor vehicle policy); W. Va.Code § 33–30–13 (1996) (subrogation related to mine subsidence insurance policies); W. Va.Code § 46–4–407 (1993) (subrogation right of payor bank on improper payment).

**13.** In this rapidly changing era of health care coverage and managed care, we are aware that the relationship between a medical provider and a patient may become more like an insurance relationship than it traditionally has been. For instance, a patient and a medical provider may enter into a contract whereby the patient pays the medical provider a premium to guarantee certain medical services will be rendered if they ever become necessary. Such a contract may well contain a subrogation provision. At the present time, we are not in a position to comment on such contracts, nor is it possible for us to foresee all the potential relationships between a medical provider and a patient that may exist someday. Our decision today is limited to the traditional medical provider-patient relationship, and we will address other situations as they may arise in the future.

**14.** The Plaintiff makes a statement in his brief that "courts will not impose upon patients the unconscionable implied promise to pay for any and all services rendered, regardless of whether such services are reasonable or necessary." The Plaintiff seems to argue, therefore, that any implied contract between himself and the Foundation is unconscionable in light of the fact the Foundation presented no evidence the medical expenses either were reasonable or necessary. We find, however, the Defendant, who apparently was the one challenging the reasonableness, necessity, and proximate cause of the Plaintiff's medical treatment, never raised those challenges at the hearing attended by the Foundation. Moreover, the Plaintiff never alleged at the hearing that any "implied promise" requiring him to pay his medical bills should be extinguished because the services he received were not reasonable or necessary. Instead, the Plaintiff argued he should be relieved from payment because he would not be fully compensated by the settlement and he was in need of further medical treatment. Thus, we find the issue of unconscionability of contract was not litigated, and we refuse to address this issue for the first time on appeal. *See Whitlow v. Board of Educ.*, 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) (stating that "when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal").

*judicata* for a claim that has not been brought, given the posture of this case, it is clear that if the Foundation brings a contract action against the Plaintiff it would not be barred by *res judicata*.

 *Res judicata*, or claim preclusion, "generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided or the issues that could have been decided in the earlier action." *State v. Miller*, 194 W.Va. 3, 9, 459 S.E.2d 114, 120 (1995) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308, 313 (1980); *In re Estate of McIntosh*, 144 W.Va. 583, 109 S.E.2d 153 (1959)). "A claim is barred by *res judicata* when the prior action involves identical claims and the same parties or their privies." *Id.* In other words, as summarized by the United States Supreme Court: "Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552, 559 n. 5 (1979).[15] In the present situation, the cause of action in the underlying case was a tort action between the Plaintiff and the Defendant. Therefore, if the Foundation brings a contract action against the Plaintiff, *res judicata* cannot be applied because the necessary requirements of the doctrine will not be met.

### III.

### CONCLUSION

For the foregoing reasons, we find the Circuit Court of Cabell County erred as a matter of law with respect to the Plaintiff's obligation to pay the Foundation. Therefore, we reverse, in part,[16] the decision of circuit court and remand this case to permit the

**15.** *Limited on other grounds by United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

**16.** The Foundation explicitly stated to the circuit court that it did not object to the actual settlement, and the Foundation told this Court it did

Foundation to pursue collection of the Plaintiff's unpaid bills.

Affirmed, in part, reversed, in part, and remanded.

RECHT, Justice, sitting by temporary assignment.

not seek to make a collection out of the settlement proceeds. Consequently, we see no reason to disturb the circuit court's decision as to the settlement agreement made between the Plaintiff and the Defendant. Accordingly, we affirm that part of the order.