SOUTHERN STATES COOPERATIVE
INCORPORATED, a Virginia
corporation, Plaintiff,

v.

I.S.P. COMPANY, INC., a West Virginia
corporation; Steven J. Garvin, as
President of I.S.P. Co. and Individual-
ly; and Diane E. Garvin, as a repre-
sentative of I.S.P. Co. and Individual-
ly, Defendants.

No. Civ.A.1:01CV31.

United States District Court,
N.D. West Virginia.

March 19, 2002.

G. Thomas Smith, David C. Glover, Waters, Warner & Harris, Clarksburg, WV, for plaintiff.

Steven J. Garvin, pro se.

## ORDER GRANTING–IN–PART AND DENYING–IN–PART PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM

KEELEY, District Judge.

On February 28, 2002, the Court conducted a hearing regarding Southern States Cooperative, Incorporated's ("Southern States") motion to dismiss the defendants' counterclaim for failure to state a claim pursuant to F.R.Civ.P. 12(b)(6). Southern States appeared by its attorney and the defendants, Steven Garvin and Diane Garvin ("the Garvins"), appeared in person and without counsel.

At the hearing, the Court **DENIED** Southern States' motion to dismiss the counts in the counterclaim for negligence, strict liability and breach of implied warranties and **GRANTED** its motion to dismiss the claims of abuse of process, violation of the West Virginia Commercial Feed Law and violation of the West Virginia Pesticide Control Act.

## I. STATEMENT OF THE FACTS

On a motion to dismiss, pursuant to F.R.Civ.P. 12(b)(6), the Court views the facts in the light most favorable to the defendant. *Mayes v. Rapoport*, 198 F.3d 457, 460 (4th Cir.1999).

The counterclaim filed by the Garvins alleges that they operated a thoroughbred breeding operation in Salem, West Virginia and purchased feed for all of their horses from Southern States' retail store located in Clarksburg, West Virginia. According to the Garvins, in April 2000, their prize stallion, Oswald, developed abscessed feet and contracted edema, and, on May 31, 2000, their brood mare, Grounds for Divorce, became bloated and died. During this time, the Garvins' other horses also became ill and bloated.

On June 4, 2000, Steven Garvin found Brodifacoum rodenticide, a rat poison, in a bag of feed purchased from Southern States. He immediately hired a veterinarian to examine his horses, and the veterinarian discovered that the blood clotting time in the horses was two times slower than the normal rate, a symptom compatible with rat poison consumption. The Garvins contend that, on June 7, 2000, employees of Southern States discovered chunks of rat poison in the supplies of whole corn at its Clarksburg store.

On June 13, 2000, a necropsy was performed on Grounds for Divorce that revealed "multiple areas of large ecchymotic lesions under the secrosal layer of the small intestine that appeared to be premortem, approximately three to four liters of hemorrhagic fluid in the pertoneal cavity and green stains on the liver." The Garvins allege that these symptoms also are compatible with rat poison consumption.

As a result of Oswald's declining health, he was euthanized on November 27, 2000.

The Garvins then placed their remaining horses for adoption due to their ill health, devaluation and maintenance expenses.

## II. *PROCEDURAL HISTORY*

### *Case I*

On September 29, 2000, Southern States filed a complaint against I.S.P. and Steven Garvin to perpetuate testimony and facts relating to the condition of the horses and the defendants' land. Subject matter jurisdiction was premised on diversity jurisdiction. Southern States is incorporated and maintains its principal place of business in Virginia. The defendant, I.S.P., is incorporated and maintains its principal place of business in West Virginia, and the defendant Steven Garvin is a citizen and resident of West Virginia.

Following the parties' agreement that this civil action could be dismissed due to the pending federal and state civil lawsuits between the parties, the Court dismissed Case I with prejudice on June 18, 2001.

### *Case II*

On February 28, 2001, Southern States sued I.S.P. and the Garvins in federal court, alleging defamation, product disparagement and tortious interference with business relationships. Subject matter jurisdiction again was based on the parties' diversity of citizenship.

The Garvins and I.S.P. filed an answer and counterclaim on June 29, 2001. That counterclaim alleges that Southern States violated provisions of West Virginia's Uniform Commercial Code, Commercial Feed Law and Pesticide Control Act. Additionally, there are claims for negligence, strict liability and abuse of process. Southern States has filed a motion to dismiss Case II.

### *Case III*

On March 7, 2001, Steve Garvin and I.S.P. sued Southern States in the Circuit Court of Harrison County, alleging the same violations of West Virginia's Commercial Feed Law, Pesticide Control Act and Uniform Commercial Code and claims for negligence and strict liability pending in federal court. In addition, the complaint alleged violations of West Virginia's Consumer Credit and Protection Act and contained a claim for breach of contract, but it did not allege an abuse of process claim. Southern States filed a motion to dismiss this complaint on April 10, 2001, which the circuit court denied on January 29, 2002.

## III. *LEGAL ANALYSIS*

### A. *Preclusive Effect of State Court Ruling*

Because the counterclaim in federal court essentially presents the same claims as those alleged in state court, this Court must determine whether the circuit court's ruling on the motion to dismiss has any preclusive effect on the action here.

■ "A federal court, as a matter of full faith and credit, under 28 U.S.C. § 1738, must give a state court judgment the same preclusive effect as the courts of such State would give." *Heckert v. Dotson*, 272 F.3d 253, 257 (4th Cir.2001); 28 U.S.C. § 1738.

"The Supreme Court and our cases have made clear that a federal court must 'refer to the preclusion law of the State in which the judgment was rendered.'" *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Heckert v. Dotson*, 272 F.3d at 257.

■ In West Virginia, "under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Blake v. Charleston Area Medical Center*, 201 W.Va. 469, 476, 498 S.E.2d 41, 48 (W.Va.

1997); *Porter v. McPherson*, 198 W.Va. 158, 166, 479 S.E.2d 668, 676 (W.Va.1996). "The rationale underlying the preclusive effect of res judicata is to avoid 'the expense and vexation' attending relitigation of causes of action which have been fully and fairly decided." *Blake*, 201 W.Va. at 476, 498 S.E.2d at 48; *Sattler v. Bailey*, 184 W.Va. 212, 217, 400 S.E.2d 220, 225 (W.Va.1990).

Comparing the identity of two suits for purposes of res judicata, West Virginia's highest court, has stated:

"A cause of action" is the fact or facts which establish or give rise to a right of action, the existence of which affords a party a right to judicial relief. The test to determine if the cause of action involved in the two suits is identical is to inquire whether the same evidence would support both actions or issues. If the two cases require substantially different evidence to sustain them, the second cannot be said to be the same cause of action and barred by res judicata.

*Blake*, 201 W.Va. at 476, 498 S.E.2d at 48; *White v. SWCC*, 164 W.Va. 284, 290, 262 S.E.2d 752, 756 (W.Va.1980).

■ The requirements of the doctrine of res judicata contemplate a final adjudication by a court that has jurisdiction of both the subject matter and the parties in the litigation, "not only as to the matters actually determined, but as to every other matter which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject-matter of the action." *Blake*, 201 W.Va. at 476–477, 498 S.E.2d at 48–49. In the state case filed by the Garvins, the circuit court denied Southern States' motion to dismiss as to all claims, including those currently pending in this Court.

■ Pursuant to W.Va.R.Civ.P. 12(b)(6), a dismissal of claims for failure to state a claim upon which relief can be granted, and without reservation of any issue, is presumed to be on the merits. *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 461, 211 S.E.2d 674, 696 (W.Va.1975). Here, however, Southern States' motion to dismiss was denied and all claims remain pending.

Thus, the circuit court's ruling did not amount to a final adjudication on the merits. *See Arroyo v. K–Mart, Inc.*, 81 F.Supp.2d 301, 310 n. 18 (D.P.R.1999) (holding that the district court's denial of the 12(b)(6) motion to dismiss did not have the requisite finality to be a final judgment); *Laing v. Shanberg*, 13 F.Supp.2d 1186, 1191 (D.Kan.1998) (holding that there was no judgment on the merits where the state court judge denied a motion to dismiss without comment).

"A final judgment of one court in an in personam case ordinarily will preclude further duplicative proceedings in the other court." *Donovan v. City of Dallas*, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964) (stating that a state court and federal court with concurrent jurisdiction over an in personam suit may proceed until one court delivers a final judgment); Moore's Federal Practice 3D § 120.20(3).

Because no final judgment was entered in state court, the doctrine of res judicata does not apply to the case in this Court.

### B. *Southern States' Motion to Dismiss*

#### 1. *Standard of Review*

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), dismissals are rarely granted. *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). Generally, a court should not dismiss a complaint for failure to state a claim "unless it appears certain that the [claimant] can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993), *cert. de-*

*nied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). In making this determination, a court must view the complaint in the light most favorable to the claimant, accepting as true all well-pleaded factual allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995).

## 2. *West Virginia Commercial Feed Law*

The Garvins' counterclaim alleges the following violation of the West Virginia Commercial Feed Law:

26. The plaintiff, Southern States, manufactured, distributed, and/or sold the aforementioned adulterated feed in violation of provisions of the West Virginia Commercial Feed Law, West Virginia Code § 19–4–1, et seq.

Southern States argues that the defendants have failed to state a cause of action under the West Virginia Commercial Feed Law because it does not create a private cause of action and does not regulate whole corn. Southern States also argues that the Commercial Feed Law is preempted by FIFRA.

### a. *Private Cause of Action*

■ The Garvins contend that W.Va. Code § 55–7–9 creates an implied private cause of action under the West Virginia Commercial Feed Law. Section 9 states:

*Violation of statute*

Any person injured by the violation of any statute may recover from the offender such damage as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages.

■ In determining whether this statute creates a private cause of action, the Court must consider not only the language

of § 55–7–9, but also the following four factors:

(1) [T]he plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.

Syl.Pt. 1, *Hurley v. Allied Chem. Corp.,* 164 W.Va. 268, 262 S.E.2d 757 (W.Va. 1980). *Accord Wolford v. The Children's Home Society of West Virginia,* 17 F.Supp.2d 577, 583 (S.D.W.V.1998); and *Reed v. Phillips,* 192 W.Va. 392, 396, 452 S.E.2d 708, 712 (W.Va.1994).

■ Based on these factors, the West Virginia Commercial Feed Law does not give rise to a private cause of action under the facts of this case. First, the Garvins are not part of the class of individuals the statute was enacted to benefit. The Commercial Feed Law is wholly regulatory in nature and intended to benefit the general public by providing standards for commercial feed. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)).

Second, in 1991, when the legislature enacted the Commercial Feed Law, House Bill No. 2583, it did not evince an intent to permit private enforcement of the statute. Although there is neither legislative history nor case law relating to the West Virgi-

nia statute, in *Emerald Pork v. Purina Mills Inc.*, 17 F.Supp.2d 816 (C.D.Ill.1998), a district court found that a similar Illinois statute did not give rise by implication to a private cause of action. The court recognized that the state general assembly, in enacting the Illinois Commercial Feed Act, had authorized the Director of the Illinois Department of Agriculture to enforce the statute "rather than relying upon individuals to bring suits either on their own behalf or acting as private attorney generals [sic]." *Id.* at 817.

When determining legislative intent, the Second Circuit recently stated that the analysis must begin with a review of the text and structure of the statute. *Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429, 431–32 (2d Cir.2002). In holding that the Investment Company Act of 1940(ICA), 15 U.S.C. § 80a–1, *et seq.* (Supp.2001), provides no private cause of action for violations of particular provisions of the Act, it considered that Congress had not explicitly provided a private cause of action for the violations at issue, that the ICA authorized the Securities and Exchange Commission to enforce its provisions, and that Congress explicitly had provided a private cause of action for the enforcement of other sections of the Act. *Id.* at 431–34. Furthermore, where a statute is unambiguous, legislative history is "instructive only upon 'the most extraordinary showing of contrary intentions.'" *Id.* at 435 (quoting *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). Here, West Virginia's Commercial Feed Law does not explicitly provide a private cause of action to those, such as the Garvins, who are not regulated persons under its provisions. The intent of the legislature in enacting the Commercial Feed Law was to establish a comprehensive regulatory scheme that delegates substantial enforcement authority to the Commissioner of Agriculture.

For example, the Commissioner is authorized to enter and inspect locations where commercial feed is manufactured, distributed and transported. He also can perform tests on commercial feed, issue permits and registrations, collect fees and penalties, conduct sampling, conduct hearings, assess penalties, establish and maintain feed testing facilities, report analytical results, publish and distribute reports and promulgate administrative rules. W.Va. Code § 19–4–3. This delegation of authority is so encompassing as to indicate that the legislature did not intend to rely on the public to enforce the statute through private causes of actions.

Third, a private cause of action is not consistent with the underlying purpose of this legislative scheme, which provides for criminal penalties and authorizes the Commissioner to assess civil penalties payable to the State. W.Va.Code § 19–14–15. In addition, § 19–4–7 specifically addresses available legal recourse:

*Hearings and Appeals*

(a) No application shall be refused until the applicant has the opportunity to amend his/her application to comply with the requirements of this article.

(b) No registration or permit shall be refused, suspended or revoked until the registrant or permittee shall have the opportunity to have a hearing before the commissioner.

(c) Any person adversely affected by an act, order or ruling made pursuant to the provisions of this article, may within forty-five days thereafter, bring an action for judicial review in the circuit court of the county in which the violation occurred. Any party aggrieved by a final judgment entered by a circuit court, may appeal to the West Virginia Supreme Court of Appeals.

This language indicates that only individuals regulated under the law have recourse

to the statute's administrative and judicial remedies. Because the Garvins seek no redress from an act, order or ruling made pursuant to the Commercial Feed Law, it would be inconsistent with the underlying purposes of the statute to permit them to bring a private cause of action against Southern States.

■ Finally, under the fourth factor of the test, a private cause of action under the facts here would not intrude into an area delegated exclusively to the federal government. Although Southern States asserts that the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) preempts any claims the defendants may have under the Commercial Feed Law, it clearly does not. "FIFRA is the primary federal regulatory scheme for pesticides." *Didier v. Drexel Chemical Company,* 86 Wash.App. 795, 798, 938 P.2d 364, 366 (1997). "It grants the Environmental Protection Agency (EPA) authority over registration, labeling and enforcement," and mandates the EPA to register pesticides distributed and sold in the United States. *Id.;* 7 U.S.C. § 136(a) (Supp.2001). Although FIFRA is a "comprehensive regulatory scheme," Congress did not intend for it to preempt the entire field. *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 601, 613, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).

■ FIFRA only preempts state law that permits the sale or use of pesticides prohibited under FIFRA and that imposes requirements for labeling and packaging "in addition to or different" from FIFRA. 7 U.S.C. § 136v(a)–(b); *see Hawkins v. Leslie's Pool Mart Inc.,* 184 F.3d 244, 255 (3d.Cir.1999); *Worm v. American Cyanamid Co.,* 5 F.3d 744, 748 (4th Cir.1993) (*Worm II*); *Jeffers v. Wal–Mart Stores,* 84 F.Supp.2d 775, 777, 784 (S.D.W.V.2000). In addition, the Fourth Circuit has held that FIFRA does not preempt "state-imposed standards of care relating to product design, manufacture, testing and the like . . ." *Worm v. American Cyanamid Co.,* 970 F.2d 1301, 1307 (4th Cir.1992) (*Worm I*).

The Garvins' claim, that Southern States manufactured, distributed and/or sold feed in an adulterated state in violation of the Commercial Feed Law, does not implicate pesticide regulation requirements, including labeling or packaging, under state law or FIFRA. Therefore, Southern States' preemption argument is not well founded.

### 3. *West Virginia Pesticide Control Act*

In support of their claim under the West Virginia Pesticide Control Act, the Garvins allege that:

> The Plaintiff, Southern States, manufactured, distributed, and/or sold the aforementioned adulterated feed in violation of provisions of the West Virginia Pesticide Control Act, West Virginia Code § 19–16A–1 et seq.

#### a. *Private Cause of Action*

■ As noted earlier, the provision in § 55–7–9 that "any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation" must be analyzed in conjunction with the four factors from *Hurley* and its progeny. Those factors establish that an implied private cause of action does not exist under West Virginia's Pesticide Control Act.

First, the defendants are not members of the class for whose benefit the statute was enacted. Section 19–16A–2 sets forth the stated purpose and legislative findings of the Act, and provides, in pertinent part, that "[t]he purpose of this article is to regulate and control pesticides in the public interest, by their registration, use and application." It then states that it is necessary to provide for the control of pesti-

cides because they may be injurious to man, animals and the environment. *Id.* Thus, the legislature expressly identified the public as a whole as the beneficiary of this legislation. *See Sandoval*, 532 U.S. at 289, 121 S.Ct. 1511.

Second, the intent of the West Virginia legislature in enacting this statute does not evince an implied private cause of action. When the legislature enacted the Pesticide Control Act in 1990, and amended it in 1995, it expressly characterized the Act as a regulatory statute enacted for the purpose of controlling pesticides in the public interest. Section 19–16A–4 of the Act delegates substantial authority to the Commissioner of Agriculture, including authority to receive grants, contract research projects, test pesticides and train individuals, sell, store and dispose of pesticides, promulgate rules, register pesticides, record licenses and registrations, revoke and suspend licenses, and establish a fee structure, as well as other requirements. The Commissioner also has the power to promulgate and adopt rules permitting consent agreements or negotiated settlements regarding assessed penalties. § 19–16A–22(c). This delegation of authority indicates that the legislature intended that the Commissioner, not private plaintiffs, would enforce the statute. *See Emerald Pork*, 17 F.Supp.2d. at 817.

Third, the Garvins' private cause of action is not consistent with the underlying purpose of the Act. Section 19–16A–22(a) provides for criminal penalties and authorizes the Commissioner to impose civil penalties for violations of the Act, which, under § 19–16A–22(b), are payable to the state. Persons aggrieved by an action of the Commissioner may seek review of the administrative decision in a court of competent jurisdiction. § 19–16A–20. In as much as the Garvins are not persons aggrieved by an action of the Commissioner, their cause of action is inconsistent with the underlying purpose of the Act.

Finally, unlike under West Virginia's Commercial Feed Law, a private cause of action under the West Virginia Pesticide Control Act might intrude into an area delegated exclusively to the federal government. Southern States, in fact, argues that FIFRA preempts a claim under the Pesticide Control Act. While FIFRA is not intended to preempt the entire field of pesticide regulation, *Worm*, 970 F.2d at 1307, it does preempt a state from permitting the sale or use of pesticides in conflict with its provisions, and from imposing any labeling and packaging requirements "in addition to or different from those" required by its provisions. 7 U.S.C. § 136v(a)–(b).

The Garvins generally claim that Southern States manufactured, distributed and sold the adulterated feed in violation of the Act; however, they have not alleged that any specific provision of the Act was violated. Section 19–16A–21 enumerates violations under the Act, including violations of product registration and business/applicator regulation provisions. Although the claim here would be preempted if it alleged a violation of the Act that is in addition to or different from FIFRA's regulations or standards for packaging and labeling, the Court need not decide this issue because no private cause of action arises by implication under the statute. The Pesticide Control Act is a regulatory statute intended to benefit the public as a whole, and to be enforced by the state Commissioner of Agriculture, not by private citizens.

### 4. *Abuse of Process*

 In their counterclaim, the Garvins allege that Southern States willfully and maliciously issued process against them to intimidate and harass them. As a result of

the abuse of process, the Garvins claim they have suffered annoyance, inconvenience and emotional distress, and have had to pay attorney fees and other expenses associated with the litigation.

The tort of abuse of process is well-grounded in West Virginia law. In *Preiser v. MacQueen*, 177 W.Va. 273, 352 S.E.2d 22 (W.Va.1985), the West Virginia Supreme Court of Appeals explained the claim of abuse of process as follows:

The distinctive nature of an action for abuse of process, as compared with the actions for malicious prosecution and false imprisonment, is that it lies for the *improper use* of a regularly issued process, not for maliciously causing process to issue, or for an unlawful detention of the person.

The authorities are practically unanimous in holding that to maintain the action for abuse of process there must be proof of a willful and intentional abuse or misuse of the process for the accomplishment of some wrongful object—an intentional and willful perversion of it to the unlawful injury of another.

As to the proof of malice, we have seen that such proof is not necessary as to the issuance, but is necessary to the use, of the process, in order to sustain an action of this character (emphasis added).

*Preiser*, 177 W.Va. at 279, 352 S.E.2d at 28 (quoting *Glidewell v. Murray–Lacy and Co.*, 124 Va. 563, 569, 571, 576, 98 S.E. 665, 667, 668, 670 (1919)).

In *Preiser*, the court further stated:

In an action for abuse of process, as distinguished from an action for malicious prosecution, it is not necessary to aver and prove the termination of the proceeding in which the process was issued. It is sufficient that one party has *wilfully abused the process after its is-*

*suance to the damage of the other* (emphasis added).

*Preiser*, 177 W.Va. at 279, 352 S.E.2d at 28–29 (quoting *Mullins v. Sanders*, 189 Va. 624, 633, 54 S.E.2d 116, 121 (Va.1949)).

Although West Virginia had not decided the issue explicitly, other jurisdictions have held that "the mere filing of a complaint does not give rise to a claim for abuse of process." *See Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 79 (S.D.N.Y.1995).

The Garvins rely on a Georgia case, *Torok v. Yost*, 176 Ga.App. 149, 335 S.E.2d 419 (1985), in which the Georgia Court of Appeals held that an allegation that the defendants had used a counterclaim to blackmail plaintiffs into dismissing their personal injury suit stated a claim for abuse of process. *Id.* at 421. Here, in contrast, the plaintiffs have not alleged that the defendants used the counterclaim improperly after filing it. The Garvins' complaint alleges only that Southern States caused process to issue; it does not allege that Southern States wilfully abused the process after its issuance.

### 5. Negligence, Strict Liability and Breach of Implied Warranties

■ The Garvins have sufficiently alleged claims for negligence, strict liability and breach of implied warranties. The argument of Southern States that FIFRA preempts these claims fails as the Garvins are not alleging violations of pesticide labeling and packaging requirements in their claims.

### CONCLUSION

For the reasons discussed above, the Court **GRANTS–IN–PART** and **DENIES–IN–PART** the motion of Southern States Cooperative, Inc. to dismiss the counterclaim. All claims except the claims of negligence, strict liability and breach of

implied warranties are **DISMISSED WITH PREJUDICE.**

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to counsel of record by regular mail and to the defendants by certified mail.